Bonnie TURNER

v.

**HOMECREST CORPORATION et al.**

Supreme Court of Tennessee,
at Knoxville.

Jan. 3, 2007 Session.

April 26, 2007.

Michael E. Moore, Acting Attorney General and Reporter, and Dianne Stamey Dycus, Deputy Attorney General, Nashville, Tennessee, for the appellant, Sue Ann Head, Director of the Tennessee Department of Labor Second Injury Fund.

Roger L. Ridenour, Clinton, Tennessee, for the appellee, Bonnie Turner.

T. Joseph Lynch, Knoxville, Tennessee, and Kelley Bertoux Creveling, Indianapolis, Indiana, for the appellee, HomeCrest Corporation.

## OPINION

CHARLES D. SUSANO, JR., Sp.J., delivered the opinion of the court, in which JANICE M. HOLDER, CORNELIA A. CLARK, and GARY R. WADE, JJ., joined. WILLIAM M. BARKER, C.J., not participating.*

In this workers' compensation case we granted the motion for review[1] filed by the employee, Bonnie Turner ("Turner"), in order to evaluate the correctness of the trial court's decision to award benefits to Turner against the Tennessee Department of Labor Second Injury Fund. The award was predicated upon the court's determination that Turner had sustained a 60% permanent partial disability due to a work-related bilateral carpal tunnel injury and a resulting condition of hypertension. The trial court's award in this case was made subsequent to that court's decision to award Turner permanent total disability benefits against her employer as a result of a prior injury. We hold that an employee who is permanently and totally disabled as provided for in Tennessee Code Annotated section 50–6–207(4)(A)(i) is barred from receiving additional vocational disability benefits unless the employee can establish rehabilitation from the injury which caused the permanent and total disability. This principle applies even though the employee temporarily returns to work following the first injury and suffers a subsequent work-related injury close in time. Therefore, we reverse the trial court's award against the Second Injury Fund.

I. Factual and Procedural Background

Turner is over the age of sixty. She has a high school education and has worked primarily in restaurants and factories. She performed assembly work for defendant HomeCrest Corporation ("HomeCrest") for over sixteen years.

In 1999, Turner injured her back while working at HomeCrest. A lumbar laminectomy was performed by Dr. Cletus McMahon, Jr. Dr. McMahon did not assign Turner an impairment rating at the time of her treatment. However, he testified in an August 2004 deposition that, had he done so, he would have assessed Turner's permanent partial impairment at 10% to the body as a whole as a result of the back injury. Turner missed work for approximately ten to eleven weeks as a result of the back surgery, after which she returned to work with permanent restrictions on bending. Upon her return, she continued to perform her pre-injury job responsibilities. Neither Turner nor HomeCrest filed suit in connection with her back injury.

On August 1, 2001, while striking a machine at work with a hammer, Turner injured her neck. She was originally treated by Dr. Hermann of the Clinton Family Physicians, who diagnosed, in his words, "muscle strain, biceps tendons bilaterally with pain in the neck." She was placed on anti-inflammatory drugs. She returned to work four days after her injury.

In October 2001, Turner advised HomeCrest that she had pain and numbness in both arms. On October 18, 2001, she was seen by Dr. Henry Gupton, also of the Clinton Family Physicians, who referred her to other specialists for an evaluation as to whether her pain was related to her

---

* Chief Justice Barker was a member of the Special Workers' Compensation Appeals Panel who initially heard this appeal.

1. The motion was filed pursuant to Tennessee Code Annotated section 50–6–225(e)(5)(B).

neck injury or carpal tunnel syndrome. Tests conducted by these physicians revealed carpal tunnel syndrome and cervical radiculopathy. On December 3, 2001, Dr. Gupton made a further diagnosis of hypertension.

Turner filed her first complaint for workers' compensation benefits on August 13, 2002. In this first lawsuit, she sought benefits only for her neck injury. The Second Injury Fund was not named as a defendant in this litigation.

Turner was treated by various physicians for her neck injury but continued to work on a modified basis. In June 2003, she came under the care of Dr. Robert Finelli. On September 15, 2003, he approved her absence from work and scheduled surgery on her neck. Dr. Finelli performed an anterior cervical fusion at C4–5 and C5–6 on October 2, 2003. Turner reached maximum medical improvement from the cervical fusion on November 20, 2003, following which Dr. Finelli agreed that she could return to light duty work with a twenty pound lifting restriction. He assigned her a permanent impairment rating of 28% to the body as a whole from the neck injury and cervical fusion.

On November 24, 2003, Turner met with HomeCrest's personnel manager, Jerry Riley. Turner described the conversation as follows:

> He asked me if I felt like there was anything I could do out there, you know, out in the plant, and I first told him no and then I said, well, the tubber over in the machine room I thought maybe I could do it, you know, but he told me just to go on home.

It appears that this was the last time that Turner spoke with Riley. She testified at trial that she did not believe she had been physically able to return to work at Home-Crest following the neck surgery. She further testified that she did not believe she was physically able to find employment anywhere after the neck surgery. On January 2, 2004, Turner's employment with HomeCrest was terminated because she exceeded the company's medical leave policy and had exhausted the leave due her under the federal Family and Medical Leave Act.

Dr. Gupton testified that Turner had a permanent medical impairment of 0% to 9% to the body as a whole as a result of the hypertension which he had originally diagnosed in December 2001. He stated that he initially diagnosed Turner with borderline hypertension which did not require medication, but "[f]rom about the time or close proximity to the time that she sustained the [work-related] injuries, she needed medication to control her blood pressure." She was on that medication at the time of trial. Dr. Gupton concluded that Turner's work-related injuries were a "stressor" and a "contributing factor" to her increased blood pressure.

As mentioned previously, Turner initially began having numbness and pain in her upper extremities approximately one and a half to two months after she injured her neck. She was treated by several physicians for bilateral carpal tunnel syndrome and on February 28, 2003, she was referred to Dr. McMahon for treatment of those injuries. At that time, Turner was continuing to work at HomeCrest, although she had modified work duties because of her various complaints following her neck injury on August 1, 2001. Dr. McMahon diagnosed Turner with bilateral carpal tunnel syndrome "on the left worse than the right." After Dr. Finelli performed the cervical fusion, Turner returned to Dr. McMahon in January 2004. Dr. McMahon confirmed his previous diagnosis of bilateral carpal tunnel syndrome. By this time, Turner's employment with

HomeCrest had been terminated. A couple of months later, Dr. McMahon performed carpal tunnel releases on both of Turner's upper extremities. She reached maximum medical improvement from the bilateral carpal tunnel releases on August 17, 2004. Dr. McMahon assigned a 5% permanent partial impairment rating to each of her upper extremities.

A second complaint for workers' compensation benefits was filed by Turner on January 15, 2004. The second complaint sought benefits for bilateral carpal tunnel syndrome and hypertension. In the second complaint, she sued the Second Injury Fund as well as HomeCrest.

Turner's two lawsuits were consolidated and, following a trial, the court entered a consolidated judgment. With regard to her first lawsuit involving the neck injury, the trial court concluded that Turner was permanently and totally disabled "due [to] a combination of her pre-existing lumbar injury and her cervical injury." The trial court then determined that 72% of the vocational disability benefits awarded were attributable to the cervical injury and HomeCrest was responsible for payment of those benefits. The trial court attributed the remaining 28% of Turner's vocational disability to the pre-existing lumbar injury. The trial court then stated that, had the Second Injury Fund been named as a defendant, the Fund would have been responsible for the 28% vocational disability; but because it was not named in the first lawsuit, the "portion of the award attributable to the Second Injury Fund is not recoverable by the Plaintiff." As to Turner's second lawsuit, the trial court concluded that she had a 50% vocational disability to the body as a whole from the

bilateral carpal tunnel syndrome and an additional 10% vocational disability to the body as a whole from the hypertension. The trial court concluded that the Second Injury Fund was responsible for the entire 60% vocational disability to the body as a whole from the injuries involved in the second lawsuit.

The Second Injury Fund appeals the judgment in the second lawsuit.[2] The Second Injury Fund claims the trial court erred in awarding vocational disability benefits in the second lawsuit once the trial court found Turner permanently and totally disabled in the first lawsuit.

Turner and HomeCrest maintain that the trial court's judgment is correct. Turner and HomeCrest further argue that the Second Injury Fund did not raise the issue of whether an employee who is permanently and totally disabled as provided for in Tennessee Code Annotated section 50–6–207(4)(A)(i) is barred from receiving additional vocational disability benefits unless he or she can prove rehabilitation from the injury which caused the permanent and total disability.

The record on appeal clearly establishes that the Second Injury Find raised the issue of rehabilitation prior to the entry of the consolidated judgment. Accordingly, we conclude the Second Injury Fund did not waive this issue. Hence, it is properly before us.

In the instant case, the Special Workers' Compensation Appeals Panel, in reversing the trial court's award, relied upon our decision in *Partin v. Old Republic Insurance Co.*, 580 S.W.2d 775 (Tenn.1979). In *Partin*, we addressed the issue of rehabilitation following an award of permanent

2. No one appealed the trial court's resolution of the first lawsuit; accordingly, the judgment in that case became final. We express no opinion as to the trial court's findings in that

case or the manner in which the trial court allocated its permanent total vocational disability award.

and total disability. *Id.* at 776. The employee in that case was injured in a coal mining accident in 1975; he never again worked as a result of the injuries received in that accident. *Id.* at 775. In 1976, he received an award for permanent and total vocational disability arising out of the 1975 injury. *Id.* He later sought treatment for pneumoconiosis and in 1977 he filed a claim for this occupational disease. *Id.* The medical evidence at trial showed that he was suffering from this disease when he was injured in 1975. *Id.* The trial court held that he could not recover for pneumoconiosis because he had been permanently and totally disabled since 1975. *Id.* at 776. In affirming, we said the following:

> We find that an employee who previously has been adjudicated 100% totally and permanently disabled because of traumatic injuries received in a mining accident and who has not shown a rehabilitation from his disability cannot again be declared totally and permanently disabled from pneumoconiosis. Any other result would defeat the plain meaning of total permanent disability.

*Id.*

The Panel in the instant case determined that because there was no proof that Turner had rehabilitated herself from the neck injury which resulted in her permanent total disability award in the first lawsuit, she was not entitled to any further vocational disability benefits in the second lawsuit.

## II. Analysis

◼ The issue of whether Turner was required to prove she was rehabilitated raises a question of law. Our standard of review of questions of law in a workers' compensation case is de novo with no presumption of correctness attaching to the trial court's legal conclusions. *Perrin v.*

*Gaylord Entm't Co.,* 120 S.W.3d 823, 826 (Tenn.2003).

It has long been a part of Tennessee workers' compensation law that an employee who has been previously adjudged permanently and totally disabled can be rehabilitated, return to gainful employment, and thereafter suffer a second compensable injury. For example, in *Industrial Carving Co. v. Hurst,* 223 Tenn. 469, 447 S.W.2d 871 (1969), the plaintiff was held to be permanently and totally disabled following a back injury which occurred in 1957. *Id.* at 871. After successfully rehabilitating himself, the plaintiff began working various jobs until he suffered a work-related heart attack in 1968. *Id.* The trial court held that the employer was liable for a 65% permanent partial vocational disability, and the employer appealed claiming that once an employee receives permanent and total disability benefits, the employee cannot receive any further disability benefits for a subsequent injury. We disagreed:

> It is not inconceivable that an employee, though previously adjudged permanently and totally disabled and fully compensated therefor, may rehabilitate himself and return to work. In so doing he renews his wage-earning capacity and if he suffers a subsequent injury then he is deprived of this newly acquired capacity and should be compensated for such loss.

*Id.* at 873.

In *Allkins v. Thomas Furniture Co.,* 762 S.W.2d 557 (Tenn.1988), the plaintiff had been employed as a truck driver for thirty-three years when, in 1979, he was involved in a motor vehicle accident. The plaintiff had two discs in his lower back removed and a disc in his cervical spine repaired. *Id.* at 558. The plaintiff did not return to work as a truck driver, settled a workers' compensation claim, and eventually was

awarded social security disability benefits.[3] Several years later, the plaintiff was feeling much stronger and began working at a furniture store. The employer was aware that the plaintiff had sustained a previous injury and was receiving disability benefits. *Id.* After working for nine months, on May 13, 1986, the plaintiff fell while carrying a large sofa, striking his head on the ground and twisting his back. *Id.* The plaintiff never returned to work. The trial court determined that the plaintiff was permanently and totally disabled and held the employer responsible for 10% of the benefits and the Second Injury Fund responsible for the remaining 90%. *Id.* at 559.

On appeal, we affirmed the judgment of the trial court. *Id.* at 560. In so doing, we distinguished *Partin* on the facts, noting that *Partin* involved an employee who never returned to work after having been adjudged permanently and totally disabled, and who later sought additional disability benefits for pneumoconiosis. *Id.* at 559. Because the plaintiff in *Allkins* had been rehabilitated as demonstrated by the fact that he was gainfully employed for nine months, we concluded that the plaintiff was entitled to further vocational disability benefits. *Id.* at 559–60. We stated the following:

> There is ample medical evidence in the record to sustain the conclusion of the trial judge that following the May 13, 1986, accident, appellee was totally, permanently disabled. There is also ample evidence in the record that the employee had sufficiently rehabilitated himself [following his previous injury in 1979] to return to work in 1985 and to work at strenuous labor for a consecutive period of nine months before sustaining a second accidental injury while performing the duties of his employment.

"Rehabilitation" within the meaning of the cases cited above does not refer to a clinically supervised rehabilitation program or to formal institutionalized retraining. While this might be one form of rehabilitation, the term as used in the cases refers to an employee's having the ability and willpower to return to work and to demonstrate the existence of substantial earning capacity despite his or her previous permanent total disability. *Id.* at 560.

In *Burris v. Cross Mountain Coal Co.*, 798 S.W.2d 746 (Tenn.1990), we affirmed the basic principles discussed in *Allkins* and added that the purpose behind the creation of the Second Injury Fund was to encourage employers to hire individuals with permanent physical disabilities by limiting the employer's liability in the event of a second injury. *Id.* at 748–49. We quoted the following legislative history:

> "The Second Injury Fund is opened up so that an employee who has had a 100% disability from a previous injury that has been rehabilitated and goes back on the job can then if he is injured go into the Second Injury Fund and get his recovery. This encourages the employer to hire people who have been previously injured so that they are not going to be worried about having to pay for an employee who has a problem and if he gets hurt they'll end up paying for his old injury. This protects him if that other employee got a 100% disability."

Remarks of Senator Riley C. Darnell, Senate Sponsor of the Act, May 2, 1985. Tape S–94, State Library and Archives.

---

**3.** The record in *Allkins* did not establish whether the workers' compensation settlement was for permanent partial disability benefits or permanent total disability benefits. *Id.* at 558.

*Burris,* 798 S.W.2d at 749 (footnote omitted).

■ Returning to the present case, even though Turner's neck and carpal tunnel injuries occurred close in time, she, nevertheless, suffered two distinct injuries. Therefore, the trial court was correct when it addressed the two cases separately. *See Scales v. City of Oak Ridge,* 53 S.W.3d 649, 652 (Tenn.2001) (noting that the plaintiff suffered two distinct injuries, one involving bilateral carpal tunnel syndrome and the other a back injury and stating that "[t]he fact that these two injuries became part of the same suit, after the trial court consolidated [the plaintiff's] separately filed complaints, is irrelevant."). Because Turner suffered two distinct injuries and because, under certain circumstances, the Second Injury Fund, by definition, is implicated when an employee has suffered a subsequent injury, we must determine which injury occurred first in time as between the neck injury and the carpal tunnel injury.[4]

The proof in the record shows that Turner's neck injury was the result of a sudden, traumatic injury which occurred on August 1, 2001. She returned to work following that injury. She filed suit for the neck injury on August 13, 2002. Turner was placed on light-duty work in June 2003, and was released from work altogether on September 15, 2003. She remained off work until the neck surgery was performed on October 2, 2003; she reached maximum medical improvement on November 20, 2003. Turner never returned to work after she reached maximum medical improvement.

With regard to the bilateral carpal tunnel syndrome, that injury was a gradually occurring injury with Turner's first complaint as to that injury occurring on October 18, 2001, some two and a half months after her neck injury. She received medical treatment from various physicians, and she filed her second workers' compensation suit on January 15, 2004. According to the findings of the trial court in the first lawsuit, Turner was permanently and totally disabled by the time she underwent the bilateral carpal tunnel releases. It necessarily follows that Turner remained permanently and totally disabled from the neck injury while recuperating from the carpal tunnel releases and when she reached maximum medical improvement from the carpal tunnel injuries on August 17, 2004. Presumably, Turner remains permanently and totally disabled to this day.

When considering all of the pertinent facts set forth above, we conclude that as between the cervical injury and the bilateral carpal tunnel injury, the cervical injury was clearly first in time.

■ An employee can suffer several injuries and receive different awards, and those awards can exceed 100% thereby implicating the provisions of the Second Injury Fund, *see* Tenn.Code Ann. § 50–6–208(b); but absent rehabilitation, once an employee is found permanently and totally disabled, that employee is receiving all of the vocational disability benefits available under the law. Without rehabilitation, the employee's entitlement to any *further* vocational disability benefits ends upon the finding of permanent and total disability. *Partin v. Old Republic Ins. Co.,* 580 S.W.2d 775, 776 (Tenn.1979). With certain exceptions not applicable here, the rele-

---

4. Turner's cervical and carpal tunnel injuries were actually her second and third injuries when the 1999 back injury is considered. However, for purposes of our analysis on appeal, we will refer to the neck and carpal tunnel injuries as the first and second injuries respectively.

vant statute provides that employees who are permanently and totally disabled are entitled to receive vocational disability benefits until that employee "is, by age, eligible for full benefits in the Old Age Insurance Benefit Program under the Social Security Act . . . ." Tenn.Code Ann. § 50–6–207(4)(A)(i) (2005). An employee who is receiving benefits pursuant to this statutory provision is receiving all of the vocational disability benefits available pursuant to law. Such an employee is, in effect, receiving benefits which are substantially equivalent to what that employee would have received had he or she continued working until retirement age.

In the present case, Turner was found permanently and totally disabled from the cervical injury which was at issue in the first lawsuit. The issues to be determined in the second lawsuit are when did she become permanently and totally disabled from the cervical injury and was she rehabilitated. We do not believe that simply because Turner returned to work following the occurrence of the neck injury on August 1, 2001, that she can be deemed to have been rehabilitated from that injury. Rather, we must look to when Turner reached maximum medical improvement from that first injury and what occurred after that. Turner reached maximum medical improvement on November 30, 2003. She did not work after that date, and she testified that she was unable to perform any type of employment following the neck surgery. Accordingly, Turner has not demonstrated that she has been rehabilitated from the neck injury and, therefore, she is not entitled to any further vocational disability benefits following the judicial determination in the first lawsuit

that she was permanently and totally disabled.[5]

## III.  Conclusion

We hold that Turner is not entitled to an award of workers' compensation benefits for her second injury because the evidence does not show that she was rehabilitated from the injury that resulted in the earlier award of permanent total disability. We therefore reverse the trial court's judgment awarding Turner workers' compensation benefits against the Second Injury Fund and tax the costs below against Bonnie Turner. Costs of this appeal also are taxed to Bonnie Turner and her surety, for which execution may issue, if necessary. This case is remanded to the trial court for collection of costs due below, pursuant to applicable law.

WILLIAM M. BARKER, C.J., not participating.

**5.**  We are not unmindful of the Panel's decision in *Boling v. Sak's Inc.*, No. M2003–00195–WC–R3–CV, 2004 WL 32384 (Tenn.Workers Comp.Panel Jan.6, 2004). To the extent that *Boling* can be read as reaching a holding contrary to ours, it is overruled.